Filed 10/28/20  Gardner v. Calstar Air Medical Services CA1/2
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| LORAYNE GARDNER,<br><br>　　　　Plaintiff and Appellant,<br><br>v.<br><br>CALSTAR AIR MEDICAL<br>SERVICES, LLC,<br><br>　　　　Defendant and Respondent. | A158636<br><br>(Sonoma County Super. Ct.<br>No. SCV-261027) |

Appellant Lorayne Gardner sued her former employer for disability discrimination and failure to accommodate a disability.  She appeals a judgment in favor of the employer, arguing the trial court improperly excluded evidence from the jury's consideration and erroneously determined a shift lead and trainer was not a supervisor.  We affirm.

**BACKGROUND**

Respondent Calstar Air Medical Services (Calstar) provides medical transportation services.  Employees at its transfer center take information about a patient, find him or her a bed and physician, and set up transportation to definitive care.  New employees at the company attend a multi-week "academy" in which a group hired at the same time learns the system in a classroom setting.  After the academy, new hires become trainees, working one-on-one with a "preceptor" or trainer until they meet the

1

requirements and pass a test to become a level one coordinator, the entry level position. Above the level one position are level two coordinators, lead coordinators, supervisors, and managers.

Applicants for transfer center jobs are told in their phone interviews that they must be able to work all shifts, including nights, because the center operates "24/7."[1] Every six months, there is a staff rotation and employees can bid for the shifts they prefer ("shift bid"); their preferences are taken into account but are secondary to business operations needs. Many witnesses with experience on both shifts testified that the day shift is much busier and more stressful than the night shift, with a considerably higher volume of calls, including more complicated issues such as long term care placement, mental health placement, and non-emergent transfers, as well as the same emergency calls the night shift would receive.[2] One transfer center supervisor testified that the call volume on night shift was about a third of the day shift volume.

Gardner was hired in May 2016, by Lynn Smith-Kinniburgh, the transfer center manager. After her weeks of academy training, Gardner became a transfer center coordinator trainee assigned to the night shift. There were issues between her and her first trainer, Jeff Sevigny.[3] After

---

[1] Gardner acknowledged having been told during her interview that all employees must be willing to work all shifts.

[2] One witness noted that the night shift had less staffing and calls that tended to be more urgent, requiring immediate action and faster processing.

[3] According to shift supervisor Stephanie Gavin, Gardner did not like Sevigny and felt he was not helping her. Gavin felt Sevigny was helping and Gardner "just does not want to hear anything he says"; in an October 27, 2016 email, she told Kinniburgh she believed Gardner felt "if she complains enough she will be moved to a day shift which is where she wants to be and she has stated that multiple times." Gavin knew there were a few other

Sevigny was transferred to the day shift, Gardner's trainer was Caitlin Sassman. When Sassman was transferred to the day shift to fill a staffing need at her level of experience, Kinniburgh denied Gardner's request to be transferred with her.[4]

Supervisors and coworkers testified that Gardner made clear throughout her employment that she did not want to work on the night shift. The only reasons they were aware of related to Gardner's personal life.[5] Gardner testified that she first asked to be moved off the night shift around August 2016, before her health problems began.

Kinniburgh testified that she did not think Gardner would have been successful on the day shift; based on job performance, Gardner was not qualified to transfer to a trainee position on the day shift because her training logs demonstrated she was not able to manage the lesser call volume on the night shift. For this reason, when Gardner requested day shifts for

employees who had problems working with Sevigny, and Sevigny was later terminated for inappropriate behavior with other employees.

Gardner testified that she had problems with Sevigny because they had "different communication styles" but worked out their issues before he moved to the day shift. Sevigny also testified that they resolved a lot of their issues and became friends.

[4] Gardner texted Kinniburgh, saying she did not understand why a new trainee was being assigned to "the busy day shift with my trainer when I am a more seasoned trainee," and Kinniburgh responded, "[i]t's because you're the more seasoned trainee that I'm leaving you on a busy night shift with less staffing."

[5] The only specific reason Gavin heard was that working the night shift, Gardner did not get to spend as much time with her boyfriend. Victoria Laiosa testified that the only specific thing Gardner mentioned was being frustrated that her friends were doing things when she had to sleep. A coworker did not recall specifics but believed "it just didn't work for her personal life" and she "didn't want to be on that shift."

the rotation starting in January 2017, she was kept on night shift.[6]

Gardner's supervisors, Gavin and Victoria Laiosa, testified to similar effect.[7]

On April 10, 2017, Kinniburgh met with Gardner to explain that she was being kept on the night shift with a trainer who Kinniburgh testified was the one assigned to trainees who were having difficulty, as a "last-ditch effort." During the meeting, Gardner left Kinniburgh's office, returned and "tossed" across the desk a note from Nurse Practitioner Rachel Manktelow at Rocklin Family Medicine stating, "Please consider switching Lorayne to

---

[6] Kinniburgh testified that because of Gardner's performance issues, in early 2017, she asked the human resources department (HR) what the process would be if she needed to release an employee for failure to pass the training program. She did not take any steps toward terminating Gardner's employment because they were working through the process of assigning her to a different trainer and hoped to avoid having to release her after spending almost a year on her training.

[7] Gavin testified that she did not think Gardner could have worked on the day shift for the same reasons she believed Gardner was not ready to become a level one coordinator: Gardner missed questions that had to be asked in every intake, did not follow the flowchart approved by the hospitals Calstar worked with, and her attitude was "not up to where it should have been at that point." Laiosa, who was Gardner's supervisor from the end of November 2016 to April 2017, testified that Gardner's call logs indicated she was not following flowcharts, not using resources in general and not using the question sheet for intake on new calls, and that these issues were continuing in April 2017. One of Laiosa's examples was a February 2017 call involving a critical patient suffering a serious heart attack. Another was a call concerning a patient who frequently needed to be transferred from clients' hospitals to Kaiser for insurance reasons: Gardner made jokes about the patient needing to be transferred so often, which made Laiosa feel Gardner was not taking the job seriously. A coworker who was asked by a supervisor how Gardner's training was going observed, that she "seem[ed] to have a hard time understanding the flow of what we do," including not following the flowchart for how to handle a given type of call, not getting the specified information, not answering calls, and spending time on her personal phone.

working day shift starting April 26, 2017. She has had multiple medical problems which may be directly related to her working the night shift. I have seen and examined her in my office today. [¶] If you have any questions, please contact myself or Dr. Julie Baur." Gardner testified that she had gone to a scheduled doctor's appointment on April 10 and asked for a note requesting a shift change because her health was declining on the night shift.

Kinniburgh did not ask Gardner the health reason she could not work the night shift; she testified, "it's none of my business." She forwarded Manktelow's letter to HR, saying she had advised Gardner there was not much she could do because the letter did not say Gardner could not work the night shift and Kinniburgh "was not in a position" to "permanently assign her to a day shift." She testified that she told Gardner there was nothing she could do with the letter because there was not enough information to tell her what Gardner could and could not do. Kinniburgh testified that HR made the final determination on accommodations for employees, but she was involved in the discussion by advising HR "whether or not you have the space available to accommodate something."

On April 12, Gardner obtained another note from Manktelow stating, "Patient has developed a worsening medical illness directly related to working night shifts. Work accommodation is necessary for her current position is to work only day shift, 5:45 a.m., 5:45 p.m. No night shift work. No other special accommodations are necessary." Kinniburgh forwarded the note to HR on April 13, saying, "I cannot accommodate this."

On April 19, Kinniburgh and Susan Silva, Calstar's HR director, met with Gardner. Gardner was told she would be given a reasonable accommodation questionnaire used by the company when clarification from an employee's medical provider was needed, and Silva explained the

interactive process required under the Americans with Disability Act (ADA). Because the medical note said Gardner could not work nights, and the company needed further information to be able to determine what accommodation could be provided, Gardner was taken off the schedule pending determination of the request for accommodations. Silva told Gardner about state disability insurance as a potential interim measure, and although Gardner had not been with the company long enough to qualify for state or federal protected leaves, offered her a temporary leave pending determination on her request for accommodation. Silva explained to Gardner that in order to make a determination, she needed to understand Gardner's limitations—as, for example, a limitation on standing for a person with a sprained ankle or other leg problem. Silva testified that an employee is not required to explain what their disability or medical condition is and she did not want to know the specifics of Gardner's, but while the medical notes made it clear that the provider was requesting an accommodation, they were not clear "as to what the limitations were." Gardner testified that at the meeting she tried to tell Silva and Kinniburgh about her health problems, but they were adamant about not wanting to know the specifics.

Manktelow filled out the reasonable accommodations questionnaire on April 19. She checked "yes" for the question, "[d]oes this employee have a disability," but checked "no" for "[a]re there any job functions that Employee is unable to perform as a result of the disability for which you are providing treatment?" The recommended accommodation was, "I recommend patient to work 5:45 a.m. to 5:45 p.m." As an alternative accommodation, Manktelow wrote, "Working any shift that does not include the hours between 11 p.m. – 4 a.m. would work for my patient's illness."

Kinniburgh testified that this form "didn't tell me anything. It told me that she had a disability, but she could still do her job." Kinniburgh understood that HR was going to reach out to Gardner and her doctor to try to "get clarity on what the limitations were that she would not perform during her work hours."

Silva testified that the questionnaire did not provide all the information needed and left her confused as to whether Gardner had a disability that qualified under the ADA. The response stating there were no job functions Gardner was unable to perform was not helpful because "one of the central functions is to be able to work nights or days" and Silva was trying to determine whether, if there was no availability on the day shift, there was something else to explore as an accommodation. Silva acknowledged that "no night shift work" could be interpreted as a limitation but testified that she needed to know "what functions applied," such as whether Gardner could stand, walk, keyboard, or answer the phone.

After Silva received the questionnaire responses, Gardner asked whether, in order to avoid a loss in pay, she could work nights while the matter was being considered. This further confused Silva about whether Gardner had a disability that qualified under the ADA because Gardner was saying she could work nights after saying she had a condition that required her to not work nights. Silva was also confused by an email from Gardner stating, with reference to Silva having suggested Gardner could file for disability insurance, "I am not disabled and the note is not for disability accommodations so I feel that would be inappropriate of me to file that." This left Silva confused as to whether Gardner was disabled and whether she was asking for an accommodation. Gardner testified that she did not apply for

7

state disability because it requires an "inability to work at all" and she was able to perform her job duties, just not at night.

On April 28, Tracy Haines, an HR representative, requested further clarification from Gardner's medical provider, stating, "[w]e do not have adequate information to determine what functions [Gardner] is unable to perform or that may be impacted due to a disability. Further, we need clarification regarding her limitations along with duration of any limitations."

On May 3, Silva emailed Gardner explaining Calstar's continuing confusion as to whether she could or could not work her shift. Silva explained why staffing issues and Gardner's need for further training made it difficult to move her to the day shift. Responding to Gardner having said there were employees willing to switch shifts with her, Silva expressed willingness to "explore the possibility" but said it would be necessary to determine whether they were "of a comparable level of experience" and how long the doctor anticipated Gardner being unable to work the night hours. Silva told Gardner, "At this time without further clarification from your doctor and with you stating you have no disabilities and are able to perform you[r] job, we need . . . you to report to work for your next schedule shift. . . . If you maintain you are unable to work between the hours of 11:00 pm and 4:00 am for medical reasons, then we need to consider you unable to work and will keep you off the schedule."

In an email on May 9, Haines told Gardner Calstar had provided further clarification requested by her doctor's office and "without further information with clear directives from your provider, we will expect you to work your regularly scheduled shift tomorrow night, Wednesday May 10, 2017. At this time, we do not have supporting documentation that shows you

8

are unable to work your regularly scheduled shifts or that allows us to consider a reasonable accommodation due to disability." Gardner understood this to be a rejection of her request for accommodations. She responded, "As my original doctors note stated for health reasons I am unable to work my night shift. I have spoken to my attorney about this and I will not be coming in for the night shift tomorrow May 10, 2017."

Haines emailed Gardner on May 10 that the doctor's note did not say she was unable to work nights, "[i]n fact, it says that you have no work limitations at all. For that reason, it appears from the note that you simply prefer not to work nights, not that you are medically unable to do so." Haines said they were seeking clarification from the doctor but in the meantime would consider Gardner's absences unexcused, and "depending in part on what your doctor says," refusal to show up for scheduled shifts could lead to discipline for insubordination. Haines further stated that even if the doctor said there was a medical reason Gardner could not work the night shift, the company "may or may not be able to accommodate that request" and would not be able to make the determination "until we learn more from your doctor." Haines told Gardner to let her know immediately if she agreed to work her scheduled shift and reminded her she was "behind" in her training.

Also, on May 10, Manktelow sent Calstar a copy of the reasonable accommodations questionnaire on which she added to the alternative accommodation recommendation, "for the next 6 months."

Gardner understood Haine's May 10 email to be a second refusal to accommodate her. She responded to Haines with an email quoting the second medical note saying she had a "worsening medical illness directly related to working night shift" and "[w]ork accommodations necessary for her

9

current position is to work only day shift." Gardner said, "I am not being insubordinate I am following my doctors note."

In a May 17 letter, Manktelow stated, "Lorayne has a medical condition which has been worsened by working her night shift. Her disability constitutes her medical condition, but does not prevent her from performing her job, her night shift work only intensifies her medical illness. [¶] She is not disabled, as cannot perform her job duties."

On May 19, Haines emailed Gardner, stating simply, "Please report to work at 0830 on Monday, May 22, 2017 to attend academy training. Training will be Monday through Friday from 8:30 am to 5:00 pm for the next 3 weeks." Haines testified that this email was as short as it was because she was only confirming what she had been told was an agreed upon course forward, that Gardner would go to the academy for three weeks and then into a day shift role. Calstar's attorney told Haines that he and Gardner's attorney had discussed this solution and agreed to it. Kinniburgh testified that the plan for Gardner to return to the academy was intended to "reset her training" and give her more support, then have her work as a patient follow-up coordinator on the day shift and, once she got through her training, "look at putting her back into a coordinator trainer" position and see if she could pass the test. Gardner's pay would have remained the same.

Gardner testified that nothing in Haine's email indicated Calstar was giving her a position on the day shift following the academy. Gardner had never heard of someone being sent back to academy training, and this seemed

10

like a demotion to her. She felt uncomfortable going back, uncertain of what would follow and fearful of being terminated.[8]

Gardner's attorney left a voicemail message saying Gardner would not attend the training on May 22. The message said Gardner had decided she did not want to return to the job, she had been taken off the schedule and "proceeded accordingly," she did not have "adequate assurances that . . . the work environment is going to be different," and she wanted to proceed with her claim.

In a letter dated May 22, Haines told Gardner, "Our plan had been for you to attend that class for three weeks, after which we were going to assign you to the day shift, which is what you had requested. After finally receiving clarification from your health care provider on Friday morning, we were willing to extend this shift to you as a reasonable accommodation. Now that you have decided you do not wish to work the shift that you had requested, we will assume you have resigned your employment." Gardner testified that this letter was the first time she heard Calstar was granting her reasonable accommodation request and that she never notified the company she was rejecting the accommodation offer and resigning. She was "perplexed" at being simultaneously notified that her request for accommodation was being granted and that she was being terminated, and felt the termination was discriminatory.

Manktelow testified that Gardner came in on April 10 for stress and asked for a note saying she could not work nights. Asked if the hours

---

[8] Kinniburgh testified it was "quite common" for employees to be sent back to academy training and sometimes staff members attended voluntarily "if they wanted a refresher." For example, she noted that recently, almost two-thirds of the staff returned to academy training because there had been so many changes in "mental health components."

specified in her recommendation that Gardner not work from 11:00 p.m. to 4:00 a.m. came from Gardner, Manktelow testified, "I think we came up with that together." She took Gardner's word that these were the hours she could not function, and her statement that working the night shift intensified Gardner's condition, reflected Gardner's report to her. Manktelow testified that she understood a "job function" to be "[t]yping, lifting, talking, whatever her job functions were," and did not consider a shift to be a job function. Asked about the May 17 note stating Gardner "is not disabled" and "cannot perform her job duties," Manktelow testified this was miswritten and she thought the note said, "can perform her job duties." In determining that Gardner had a disability, Manktelow did not rely on the definition set forth on the reasonable accommodation form, but that definition was consistent with her understanding. [9] She testified that it is "[v]ery typical" to "write a patient off work note for stress."

Psychiatrist Dr. Gloria Kardong evaluated Gardner in October 2018, and reviewed the medical and legal records pertaining to the case. Gardner was "very anxious and stressed and had developed a number of medical problems that were causing her additional stress." Dr. Kardong diagnosed Gardner as having borderline personality disorder, a disorder that usually presents in adolescence or early adulthood and is "characterized by

---

[9] Asked whether she used any diagnostic tool in addition to the patient's report and medical record, Manktelow testified that with Gardner's diagnosis and medical condition she "typically" uses two specified diagnostic tools for depression or anxiety and usually uses a depression questionnaire; she did not know whether she did this in the present case. In deposition testimony she had said she did not believe she had given Gardner a depression/anxiety questionnaire because she did not change Gardner's medication and it was not noted in Gardner's chart, but she acknowledged that not everything "make[s] it into the chart."

instability an impulsivity" across a "wide variety of life areas, such as one's own internal state, moods" and affecting "relationships, work, school." People with borderline personality disorder tend to be more sensitive to changes in the environment "so that the reaction they have is amplified over what it might be for someone who didn't have this disorder." The disorder, as well as experiences while she was growing up including alcohol issues and depression in her family, fighting with her mother and repeatedly being kicked out of the house, made Gardner "more vulnerable" to stress, including the stress of working the night shift.

Dr. Kardong testified that the nurse practitioner's notes indicated Gardner was not disabled "from doing the functions of her job but she did need an accommodation to do those during the day shift." Dr. Kardong opined that Gardner was "able to do the functions of her job during the day, but was not able to do the functions of her job at night without developing all these medical problems." After leaving Calstar, Gardner stopped needing the medication she had been taking to help manage her stress. Dr. Kardong believed that Gardner's stress would have been alleviated if she had been put on the day shift and that working the day shift would have enabled her to perform her job.

Gardner testified that she learned she had borderline personality disorder from Dr. Kardong but before this had suffered symptoms of the disorder, which she understood as involving "difficulty keeping solid relationships" and anxiety, and stemming from traumatic events in one's past. She was taking Xanax and seeing a mental health professional once a week. She first noticed health problems related to working the night shift around December 2016 or January 2017, and first went to the doctor for these issues in February 2017, for physical problems. Toward the end of her

13

training, she noticed she was having problems with her "cognitive response"; the longer she was on the night shift, the more she realized she was having difficulty. She expressed this to various coworkers, as well as Sevigny and Sassman. She had a "major" issue in March, which she mentioned to Sassman, who was "very empathetic." Asked whether Manktelow put her through any tests before writing the April 10 note, Gardner responded, "In the health care field, they have depression questionnaires. She asked me a series of questions regarding my depression and anxiety. Gardner later testified that she was feeling depression and anxiety while working night shifts.

Gardner testified that when Sassman was moved to the day shift, they discussed wanting Gardner to go with her because they got along and felt Gardner's training was progressing. Gardner felt Sassman advocated for her, and when she was not permitted to go to the day shift Gardner was upset because she did not understand why she was "being treated unfairly." She testified that Kinniburgh had never told her she was not performing well or progressing in her training. She had never been told that working all shifts was an essential job function for a transfer center coordinator before Silva said this in an April 26, 2017 email. Asked whether she believed it was an essential job duty, Gardner replied, "not for eight months straight."

Gardner's complaint, originally filed on July 25, 2017, went to trial on four claims against Calstar for violation of the California Fair Employment and Housing Act (FEHA): retaliation for requesting a disability accommodation, disability discrimination, failure to accommodate a known disability, and failure to engage in a good faith interactive process regarding

14

a known disability.[10]  The jury rendered verdicts in Calstar's favor, finding Gardner did not have a disability that limited a major life activity and Calstar did not discharge or constructively discharge her or subject her to an adverse employment action.[11]  Gardner filed a motion for judgment notwithstanding the verdict and/or new trial, which the trial court denied.

This appeal followed.

## DISCUSSION

Gardner argues she was precluded from presenting evidence of the specific symptoms that required accommodation in order to allow her to perform her job duties.  First, the trial court granted the in limine motion to exclude evidence of specific disability symptoms Calstar was not aware of, and even after defense counsel "opened the door" by eliciting Gardner's testimony that she suffered from anxiety and depression, Gardner was not permitted to produce evidence of additional symptoms including cognitive impairment, fatigue, nausea, diarrhea, chronic headaches, chest pains, and

---

[10] Several additional defendants—Air Medical Group Holdings, Inc., Reach Medical Holdings, LLC, and Silva—were dismissed before trial, and Kinniburgh, who had been named as a defendant, was dismissed during trial. Additional causes of action were resolved prior to trial:  The trial court granted a defense motion for summary judgment on a claim for negligent infliction of emotional distress, various other claims were settled out of court or dismissed by Gardner.  A cause of action for defamation was dismissed during trial.

[11] The first question on the verdict forms for disability discrimination/disparate treatment, disability discrimination/reasonable accommodation, and reasonable accommodation/failure to engage in interactive process was whether Gardner had "a disability that limited a major life activity."  The jury indicated, "No."  The verdict form for retaliation asked first, "[d]id [Gardner] request reasonable accommodation for a disability," as to which the jury found, "Yes."  The second question asked, "[did Calstar] discharge, 'constructive discharge,' and/or subject [Gardner] to an 'adverse employment action'?"  The jury indicated, "No."

15

miscarriage. As a result, Gardner argues her expert witness was not able to present evidence as to how Gardner's symptoms impeded her from performing her job duties. Additionally, Gardner challenges the trial court's determination that Sassman was not a supervisor within the meaning of the FEHA, resulting in exclusion of evidence of Sassman's knowledge of Gardner's symptoms. Gardner contends the exclusion of evidence of her symptoms denied her a fair trial and resulted in the jury finding she was not disabled.

## I.

Calstar's motion in limine sought to exclude evidence of "certain medical conditions, particularly [Gardner's] miscarriage," and limit Gardner to evidence of the conditions identified in discovery as attributable to Calstar's actions—stomach pains, ulcers, and anxiety. Calstar's main concern was that evidence Gardner suffered a miscarriage was irrelevant and likely to inflame the jury. Calstar argued Gardner did not tell Calstar about the miscarriage, it was not the underlying disability to be accommodated, Gardner had not been told by a physician that it was related to working the night shift, and Gardner had not designated an expert who would testify as to causation for the miscarriage. Gardner argued the miscarriage was relevant to explain why she sought accommodations when she did: The miscarriage was the catalyst that caused her progressively increasing anxiety, depression, urinary tract infections, diarrhea, ulcers, stress, and cognitive issues to become unbearable.

At the hearing on the motion, Calstar argued that in evaluating whether its actions were reasonable, the jury should have the same universe of facts Calstar had when it made decisions on Gardner's request for accommodations, and information subsequently learned in litigation about

16

the miscarriage and anxiety due to "a litany of life stressors" would be irrelevant and prejudicial. Gardner argued Calstar's knowledge of her conditions and symptoms was not relevant: "Regardless of what the employer knew or didn't know has nothing to do with their liability. Their liability is from whether or not they received the doctor's note and whether they timely acted on it." According to Gardner, while she was not required to disclose her medical condition to her employer in order to get an accommodation, she could not meet her trial burden of proving she was disabled without referencing all of her physical ailments. Additionally, Gardner argued evidence of her symptoms was necessary for damages, so that "even if [Calstar] were to stipulate that she was disabled . . . the jury needs to see the hardships, the emotional distress, and everything she experienced over the course of this period of time at the hands of CALSTAR, and it's critical that each and every single one of her physical and mental ailments that she was asking accommodations for comes in at trial."

The court granted the motion to exclude reference to "any specific physical pain or mental health condition that was not made known to [Calstar] prior to May 10, 2017," limiting Gardner to "what the doctors were telling [Calstar]." During trial, however, Gardner testified on cross-examination that she suffered from anxiety and depression and the trial court allowed the answer to stand over her attorney's objection. Gardner testified on redirect that she felt anxiety and depression while working on the night shift, and the medical records she introduced into evidence documented these conditions and medication prescribed for them.

"FEHA makes it an unlawful employment practice to discharge an employee or discriminate against them in the 'terms, conditions, or privileges' of employment because of a physical or mental disability or medical

17

condition. ([Gov. Code,] § 12940, subd. (a).)"[12] (*Doe v. Department of Corrections & Rehabilitation* (2019) 43 Cal.App.5th 721, 733.) It is also unlawful for an employer to "fail to make reasonable accommodation for the known physical or mental disability of an applicant or employee,"[13] to "retaliate or otherwise discriminate against a person for requesting accommodation" or to "fail to engage in a timely, good faith, interactive process with the employee or applicant to determine effective reasonable accommodations, if any, in response to a request for reasonable accommodation by an employee or applicant with a known physical or mental disability or known medical condition." (§ 12940, subds. (m), (n); *Gelfo v. Lockheed Martin Corp.* (2006) 140 Cal.App.4th 34, 54.)

---

[12] All undesignated statutory references are to the Government Code unless otherwise indicated.

[13] An employer is not required to provide an accommodation that is demonstrated by the employer to "produce undue hardship, as defined in subdivision (u) of Section 12926, to its operation." (§ 12940, subd. (m)(1).) " 'Undue hardship' means an action requiring significant difficulty or expense, when considered in light of" enumerated factors:

"(1) The nature and cost of the accommodation needed.

"(2) The overall financial resources of the facilities involved in the provision of the reasonable accommodations, the number of persons employed at the facility, and the effect on expenses and resources or the impact otherwise of these accommodations upon the operation of the facility.

"(3) The overall financial resources of the covered entity, the overall size of the business of a covered entity with respect to the number of employees, and the number, type, and location of its facilities.

"(4) The type of operations, including the composition, structure, and functions of the workforce of the entity.

"(5) The geographic separateness or administrative or fiscal relationship of the facility or facilities." (§ 12926, subd. (u).)

The FEHA defines "physical disability" as including "[h]aving any physiological disease, disorder, condition, cosmetic disfigurement, or anatomical loss" that both "[a]ffects one or more of the following body systems: neurological, immunological, musculoskeletal, special sense organs, respiratory, including speech organs, cardiovascular, reproductive, digestive, genitourinary, hemic and lymphatic, skin, and endocrine" and "[l]imits a major life activity." (§ 12926, subd. (m)(1).) "Mental disability" under the FEHA includes "[h]aving any mental or psychological disorder or condition, such as intellectual disability, organic brain syndrome, emotional or mental illness, or specific learning disabilities, that limits a major life activity." (§ 12926, subd. (j)(1).)

FEHA provides that " '[m]ajor life activities' shall be broadly construed" and includes "physical, mental, and social activities and working." (§ 12926, subds. (j)(1)(C) & (m)(1)(B)(iii).) " '[W]orking' is a major life activity, regardless of whether the actual or perceived working limitation implicates a particular employment or a class or broad range of employments." (§ 12926.1, subd. (c).) For purposes of the FEHA, limiting a major life activity means making "the achievement of the major life activity difficult." (§ 12926, subds. (j)(1)(B)(ii) & (m)(1)(B)(ii).) " 'Limits' shall be determined without regard to mitigating measures such as medications, assistive devices, prosthetics, or reasonable accommodations, unless the mitigating measure itself limits a major life activity." (§ 12926, subds. (j)(1)(A) & (m)(1)(B)(i).)

Gardner argues the trial court's exclusion of evidence of her specific symptoms was tantamount to a nonsuit, as it was impossible for her to prove she suffered from a disability without presenting evidence of her symptoms. (*Edwards v. Centex Real Estate Corp.* (1997) 53 Cal.App.4th 15, 28 (*Edwards*) [order granting in limine motion to exclude evidence "functional equivalent"

of nonsuit]; *Tan v. Arnel Management Co.* (2009) 170 Cal.App.4th 1087, 1094–1095 [judgment on pleadings based on evidence presented at in limine hearing "functional equivalent" of nonsuit]; *Fergus v. Songer* (2007) 150 Cal.App.4th 552, 569–570 (*Fergus*) [granting of motion in limine that disposes of one or more causes of action "functional equivalent" of nonsuit].) As a result, she maintains we must review the evidence most favorably to her and uphold the judgment only if it is required as a matter of law. (*Edwards,* at p. 28; *Tan,* at p. 1095; *Fergus,* at pp. 569–570.) She also argues the denial of her right to present evidence establishing her case is reversible per se. (*In re Marriage of Carlsson* (2008) 163 Cal.App.4th 281, 291; *Gordon v. Nissan Motor Co., Ltd.* (2009) 170 Cal.App.4th 1103, 1114–1116 (*Gordon*).)

The cases Gardner relies upon involve evidentiary rulings making it impossible for the plaintiff to establish one or more causes of action or trial court actions rendering a trial fundamentally unfair. In *Edwards, supra,* 53 Cal.App.4th at page 27, motions in limine "sought to bar *all* statements made by respondents and the other defendants prior to execution of the releases," which "constituted the bulk of the evidence upon which appellants base[d] their causes of action for fraud and willful misconduct." The trial court in *Tan v. Arnel Management Co., supra,* 170 Cal.App.4th at page 1090, ruled on the basis of evidence presented at an in limine hearing that prior violent crimes did not make the assault on the plaintiff foreseeable, resulting in a finding that the defendants had no duty to protect the plaintiff and judgment for the defendants. In *Fergus, supra,* 150 Cal.App.4th at page 557, the trial court's exclusion of all evidence of an oral partnership agreement was the "functional equivalent of the granting of a nonsuit" as to causes of action based on the agreement. The trial court in *In re Marriage of Carlsson, supra,* 163 Cal.App.4th at page 291, displayed impatience and repeatedly

threatened a mistrial if proceedings were not concluded quickly enough and abruptly ended the trial while counsel was in the midst of posing a question to an expert witness on the stand. In *Gordon, supra,* 170 Cal.App.4th 1103, 1106, 1114–1116, the trial court granted a motion to strike portions of the plaintiff's expert's disclosure statement that "effectively barred [the plaintiff] from presenting evidence on" his claim.[14]

Here, Gardner presented evidence of all the communications by which Calstar was informed of the claimed disability and need for accommodations. As we will further explain, the letters from Manktelow and reasonable accommodation questionnaires were the documentation used to trigger Calstar's responsibility to provide reasonable accommodations by documenting the existence of a disability that "limit[ed] a major life activity" and explaining the need for accommodations and "functional limitations" on Gardner's ability to perform essential job functions. " ' "[T]he duty of an employer reasonably to accommodate an employee's handicap does not arise until the employer is 'aware of respondent's disability and physical limitations.' [Citations.]" ' " (*Avila v. Continental Airlines, Inc.* (2008) 165 Cal.App.4th 1237, 1252, quoting *Prilliman v. United Air Lines, Inc.* (1997) 53 Cal.App.4th 935, 949–950.) Gardner cannot simultaneously contend the documentation she provided to Calstar was sufficient to establish she had a disability requiring accommodation but insufficient to allow the jury to reach the same conclusion. Gardner was not entirely precluded from presenting evidence of her disability at trial; she was precluded from presenting *some* evidence she felt would make her case stronger. The trial court's exclusion of

---

[14] The additional case Gardner relies upon, *In re Enrique G.* 2006) 140 Cal.App.4th 676, 685, held that appointment of a guardian ad litem in violation of a parent's due process rights is a trial error, subject to analysis of prejudice, not a structural error requiring reversal per se.

this additional evidence of symptoms and conditions Calstar was not aware of did not prevent Gardner from presenting her case and was not tantamount to a nonsuit.[15]  Like most evidentiary rulings, it is subject to review for abuse of discretion.  (*Tudor Ranches, Inc. v. State Comp. Ins. Fund* (1998) 65 Cal.App.4th 1422, 1431 [rulings did not foreclose "essential theory of liability"].)

Gardner's characterization of the trial court's ruling as tantamount to a nonsuit is premised on her view that evidence of all her symptoms was necessary to prove her disability at trial regardless of what information was given to Calstar.  The same view underlies her claim that she was prejudiced by the ruling.

"In the context of disability discrimination, the plaintiff initially has the burden to establish a prima facie case of discrimination.  The plaintiff can

_____

[15] As the court explained in *Gordon, supra,* 170 Cal.App.4th at page 1115, "The erroneous denial of some but not all evidence relating to a claim (see, e.g., *Zhou v. Unisource Worldwide* (2007) 157 Cal.App.4th 1471, 1480; *Tudor Ranches, Inc. v. State Comp. Ins. Fund*[, *supra,*] 65 Cal.App.4th 1422) differs from the erroneous denial of all evidence relating to a claim, or essential expert testimony without which a claim cannot be proven (see, e.g., *Kelly* [*v. New West Federal Savings* (1996)] 49 Cal.App.4th [659,] 677, *Brown* [*v. Colm* (1974)] 11 Cal.3d [639,] 647.)  In the former situation, the appellant must show actual prejudice; in the latter situation, the error is reversible per se."

Gardner's assertion that "the effective nonsuit was even acknowledged by the trial court" is not supported by the record.  After the trial court granted Calstar's motion in limine, Gardner's counsel requested a mistrial because "if we cannot present evidence related to my client's disability, we cannot prove disability which is a first requirement of what we need to prove at trial.  When asked why this would subject Gardner to a mistrial, counsel replied, "[b]ecause if we're not able to present evidence" and the court noted, "[t]hat's more of a non-suit rather than a mistrial."  The court's correction of the characterization of the motion was not an acknowledgement that the ruling amounted to a nonsuit.

meet this burden by presenting evidence that demonstrates, even circumstantially or by inference, that he or she (1) suffered from a disability, or was regarded as suffering from a disability; (2) could perform the essential duties of the job with or without reasonable accommodations, and (3) was subjected to an adverse employment action because of the disability or perceived disability." (*Sandell v. Taylor-Listug, Inc.* (2010) 188 Cal.App.4th 297, 310.)

A medical condition does not always constitute a disability; "[a]n assessment must be made to determine how, if at all, the [condition] affects the specific employee." (*Arteaga v. Brink's, Inc.* (2008) 163 Cal.App.4th 327, 348 (*Arteaga*).) " 'The determination of whether an individual has a disability is not necessarily based on the name or diagnosis of the impairment the person has, but rather on the effect of that impairment on the life of the individual.' . . . 'An individualized assessment of the effect of an impairment is particularly necessary when the impairment is one whose symptoms vary widely from person to person.' " (*Arteaga,* at pp. 348–349, quoting *Toyota Motor Mfg., Ky., Inc. v. Williams* (2002) 534 U.S. 184, 198–199 [superseded by statute on other grounds].)

Gardner takes *Arteaga* to mean she needed to present evidence of all her symptoms at trial in order to establish she suffered a disability within the meaning of the FEHA, regardless of the fact that Calstar was not aware of these symptoms. Calstar, by contrast, relies upon *Arteaga* for the principles that " ' "it is an employee's responsibility to understand his or her own physical or mental condition well enough to present the employer at the *earliest opportunity* with a concise list of restrictions which must be met to accommodate the employee" ' " (*Arteaga, supra,* 163 Cal.App.4th. at p. 349) and "[a]n employer does not have to accept an employee's subjective belief

23

that he is disabled and may rely on medical information in this respect." (*Id.* at p. 347.)

*Arteaga* involved an employee who was the subject of an investigation into missing cash when he first notified the employer that he had been experiencing pain and numbness he believed to be work related and filed claims for workers' compensation. (*Arteaga, supra,* 163 Cal.App.4th at p. 334.) He was terminated based on the results of the investigation and sometime thereafter diagnosed with carpal tunnel syndrome, which limited him only in that he could no longer play soccer. (*Id.* at p. 340.) The employee sued for violation of FEHA and wrongful termination. Upholding summary judgment for the employer, *Arteaga* concluded that the employee did not have an "actual disability" during his employment, noting that he never exhibited signs of a medical problem at work and the physician who examined him after he reported his condition found nothing wrong and returned him to work without restrictions. (*Id.* at pp. 346–347.) The *Arteaga* court explained that carpal tunnel syndrome can vary significantly between individuals in both severity and duration, illustrating why diagnosis is not sufficient and individualized assessment of the effect of a disability is necessary. (*Id.* at p. 349.) But the focus of the inquiry is on limitations on the employee's ability to do the job, not necessarily the specific symptoms of the disability: "Arteaga had pain and numbness, but those symptoms did not interfere with the performance of his job." (*Ibid.*)[16]

---

[16] Gardner points to *Arteaga* in arguing that "anxiety and depression alone were not sufficient to prove disability to the jury," and her "cognitive impairment, insomnia, chronic headaches, diarrhea, stomach pains, chest pain, depression, and miscarriage were all relevant *and* necessary to proving that these symptoms limited her ability to perform her duties on the night shift." But the *Arteaga* court's conclusion that a diagnosis of carpal tunnel

24

The FEHA regulations reflect the focus on limitations rather than symptoms.  Pursuant to the regulations, "[w]hen the disability or need for reasonable accommodation is not obvious, and the . . . employee has not already provided the employer . . . with reasonable medical documentation confirming the existence of the disability and the need for reasonable accommodation, the employer . . . may require the . . . employee to provide such reasonable medical documentation."  (Cal. Code Regs., tit. 2, § 11069, subd. (c)(2).)[17]  "When the employer . . . has received reasonable medical

syndrome was insufficient to prove disability without an individualized assessment of how the condition affected job functions reflects the court's focus on *limitations* imposed by the claimed disability.  Nothing in *Arteaga* suggests an employee is necessarily entitled to prove disability by presenting evidence to the jury of all his or her symptoms despite the employer's unawareness of them.

Gardner's assertion that the trial court ruled "an expert stating [Gardner] was disabled was sufficient," which she argues is contrary to *Arteaga,* reads the trial court's comments too broadly.  After the court granted the motion to exclude evidence of specific symptoms or conditions not made known to Calstar, Gardner's attorney asked what evidence of disability he was limited to and the court replied, "You're limited to what the doctors were telling the defendants."  Counsel said the doctors only told the defendants that Gardner was "disabled or had a condition," and urged, "I can't prove disability under the law unless I can present evidence of a disability."  The court responded, "if you have an expert testifying, she's disabled, that's evidence of a disability."  The court did not rule that an expert saying the plaintiff is disabled is "sufficient" to establish disability under the FEHA; it said such testimony is "evidence" of a disability.  The statement is not inconsistent with the principle discussed in *Arteaga,* which requires an individualized assessment of how a claimed disability impacts the employee's ability to perform the essential functions of his or her job.

[17] Further references to "Regulations" are to title 2 of the California Code of Regulations.

25

documentation, it shall not ask the . . . employee about the underlying medical cause of the disability." (Regs., § 11069, subd. (c)(3).)[18]

"Reasonable medical documentation confirms the existence of the disability and the need for reasonable accommodation. Where necessary to advance the interactive process, reasonable medical documentation may include a description of physical or mental limitations that affect a major life activity that must be met to accommodate the employee. Disclosure of the nature of the disability is not required." (Regs., § 11069, subd. (d)(1).) The employer may require documentation setting forth that the employee "has a physical or mental condition that limits a major life activity or a medical condition, and a description of why the employee . . . needs a reasonable accommodation to have an equal opportunity: . . . to perform the employee's job duties, or to enjoy equal benefits and privileges of employment compared to non-disabled employees. The employer . . . shall not ask for unrelated documentation, including in most circumstances, an . . . employee's complete medical records, because those records may contain information unrelated to the need for accommodation." (Regs., § 11069, subd. (d)(5)(B).)

If information provided by the employee "needs clarification," "the employer . . . shall identify the issues that need clarification, specify what further information is needed, and allow the . . . employee a reasonable time

_____

[18] Regulations section 11069, subdivision (c)(3) goes on to state that the employer "may require medical information, as set forth in Regulations section 11071 below, and second opinions from other health care providers." (Regs., § 11069, subd. (c)(3).) Section 11071, subdivision (d) describes "Medical and Psychological Examinations and Disability-Related Inquiries during Employment," including that an employer "may make disability-related inquiries, including fitness for duty exams, and require medical examinations of employees so long as the inquiries are both job-related and consistent with business necessity," and other provisions not directly relevant here.

to produce the supplemental information." (Regs., § 11069, subd. (c)(4).) "Documentation is insufficient if it does not specify the existence of a FEHA disability and explain the need for reasonable accommodation. Where relevant, such an explanation should include a description of the . . . employee's functional limitation(s) to perform the essential job functions." (Regs., § 11069, subd. (d)(5)(C)(1).)

These regulations make clear that an employer is not entitled to information about "the nature of" the disability for which accommodation is sought or the "underlying medical cause of the disability." (Regs., § 11069, subds. (d)(1), (c)(3).) The employer *is* entitled, however, to medical documentation of "the existence of a FEHA disability" that "explain[s] the need for reasonable accommodations," including "a description of the . . . employee's "functional limitation(s) to perform the essential job functions." (Regs., § 11069, subd. (d)(5)(C)(1).)

Gardner's focus on specific symptoms is misplaced.[19] Regardless of the details of Gardner's medical condition—the "nature of the disability"—

---

[19] Gardner takes issue with respondent's assertion that it offered to stipulate that Gardner suffered from anxiety. The relevant statement—"[i]f necessary, defendant will happily not dispute whether [Gardner], in fact, had anxiety"—was made in the course of arguing the in limine motion to exclude evidence of Gardner's miscarriage and symptoms that were not known to Calstar. Calstar's counsel argued that the jury "should be similarly situated, with the same universe of facts that the defendant had when they were making the decision to accommodate [Gardner] or not," facts revealed during discovery about "life stressors" were irrelevant because Calstar was not aware of such information, and evidence of the miscarriage would be "immensely prejudicial." Gardner argues that a "statement made in arguendo is not a stipulation." But the statement was not so much for the sake of argument as conditional— if necessary to secure the court's holding that evidence of the miscarriage would be excluded, Calstar would stipulate that Gardner suffered from anxiety. Characterizing this as an offer to stipulate is not a distortion of the record.

Calstar's obligation to provide reasonable accommodations would be triggered by medical documentation informing Calstar of the existence of a disability and explaining the need for reasonable accommodations, including functional limitations on Gardner's ability to perform essential job functions. The jury did not need to know more than Calstar knew in order to determine whether Gardner had a disability that limited a major life activity. To the contrary, as the trial court concluded in ruling as it did, allowing the jury to evaluate Calstar's conduct on the basis of information Calstar did not have at the time it made its decisions would permit an unfair use of hindsight. (*Perona v. Time Warner Cable Inc.* (C.D.Cal. Aug. 12, 2016) 2016 WL 9087260, p. *2 ["[v]iewing Plaintiff's medical condition in hindsight is not relevant to whether, at the time she was terminated, it was likely that she would have been able to return to work after her finite medical leave"].) It was within the trial court's discretion to determine that the potential prejudice from evidence of specific symptoms Calstar was unaware of—especially Gardner's miscarriage— substantially outweighed the probative value of such evidence. (Evid. Code, § 352.)

Moreover, Gardner fails to explain how the excluded evidence prevented her from establishing she suffered from a disability that limited a major life activity. Gardner presented evidence of the information she provided to Calstar, which communicated Manktelow's statements that Gardner had a disability and recommendation that she be given the accommodation of working the day shift without indicating the condition or symptoms underlying the disability. She presented Dr. Kardong's expert testimony that she suffered from borderline personality disorder, which made her more vulnerable to stress, and that when she worked at Calstar, she was able to perform her job functions during the day but unable to do so at night

28

without developing medical problems.  Despite the in limine ruling, Gardner testified that she suffered from and received treatment for anxiety and depression, and these conditions were documented in the medical records entered into evidence.[20]

The problem for Gardner was that she needed to show how her medical condition limited her ability to perform her job and, according to the evidence at trial, the job functions for Gardner's position were the same on the day shift as on the night shift—except that the day shift was *more* difficult and stressful due to the higher volume of complexity of calls.  Manktelow specifically advised Calstar that Gardner's disability did *not* affect her ability to perform the required functions, stating that her disability "does not prevent her from performing her job, her night shift work only intensifies her

---

[20] Addressing Gardner's complaint that she was prevented from presenting to the jury the expert testimony Dr. Kardong gave at the Evidence Code section 402 hearing concerning her anxiety, depression, insomnia, cognitive impairment, increased loose stools, nausea, increased home stressors, and a miscarriage related to working the night shift, Calstar argues that once Gardner's testimony about her anxiety and depression "opened the door" to evidence of her symptoms, Gardner could have attempted to recall Dr. Kardong or introduce her Evidence Code section 402 hearing testimony, and by failing to do so forfeited the issue. (*Austin B. v. Escondido Union School Dist.* (2007) 149 Cal.App.4th 860, 884–886 [where changed circumstances made previously excluded evidence potentially admissible, plaintiff waived issue by failing to attempt to lay foundation for admission].)  Gardner takes issue with this argument, insisting she *did* request that the trial court admit the transcript of the Evidence Code section 402 hearing.  The exchange Gardner cites is unclear as to who was making the request and when:  Responding to the court's comments on Gardner's request for a directed verdict on the issue of disability, her attorney stated, "Well *they* also request*ed* the subjective and the transcript of the 402 hearing be admitted into evidence . . . ."  What is clear, however, is that this exchange occurred *prior* to Gardner's testimony and is thus irrelevant to Calstar's point—that Gardner could have asked the court to revisit its in limine ruling in light of the changed circumstances created by her testimony.

29

medical illness," and that there were no "job functions" Gardner was "unable to perform as a result of the disability." Gardner asserts that the trial court's ruling deprived her of the opportunity to show how specific symptoms of her disability impacted her job duties, but does not suggest how these symptoms—most notably, the miscarriage—impacted her ability to perform job functions at night that she would have been able to perform during the day.

We conclude the trial court's ruling did not prevent Gardner from establishing her case and did not constitute an abuse of discretion. But even if we were to find error, we could not find a reasonable probability the jury would have reached a different verdict if the trial court had not excluded the evidence at issue. First, as we have said, Gardner was able to present considerable evidence that she had a disability requiring accommodation, and she does not explain how evidence of specific symptoms, including her miscarriage, would have made a different verdict more probable.[21] Second, to prevail at trial, Gardner had to prove not only that she had a disability that limited a major life activity but also that Calstar knew she had such a disability. The jury's conclusion that Gardner did not have a disability that limited a major life activity necessarily implies a conclusion that Calstar did not know she had such a disability. Even if the excluded evidence of symptoms Calstar was unaware of could have caused the jury to conclude Gardner did have a disability within the meaning of the FEHA, that evidence

---

[21] In fact, the jury may well have been aware that Gardner suffered a miscarriage. Dr. Kardong's report was in evidence, and Gardner's attorney urged the jury to go through "all the documents." In that report, the parties inadvertently failed to redact the following: "[Gardner] was prescribed fluoxetine and alprazolam due to the stress she experienced during her employment at [Calstar] which was exacerbated by the miscarriage she had during this same time."

30

could not have supported a conclusion that Calstar was aware of the disability. Accordingly, the excluded evidence of symptoms Calstar was *not* made aware of could not have resulted in a verdict in Gardner's favor.

**II.**

Gardner contends the trial court erred in determining that Sassman and Sevigny were not her supervisors. The significance of this ruling is that a " 'supervisor's knowledge of an employee's disability is imputed to the employer because '[a] supervisor is the employer's agent for purposes of vicarious liability for unlawful discrimination.' " (*Alejandro v. St Micro Electronics, Inc.* (N.D.Cal. 2015) 129 F.Supp.3d 898, 909, quoting *California Fair Employment & Housing Com. v. Gemini Aluminum Corp.* (2004) 122 Cal.App.4th 1004, 1015.) Gardner contends evidence of her supervisors' knowledge of her symptoms should have been admitted under the trial court's in limine ruling.

The FEHA defines "supervisor" as "any individual having the authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or the responsibility to direct them, or to adjust their grievances, or effectively to recommend that action, if, in connection with the foregoing, the exercise of that authority is not of a merely routine or clerical nature, but requires the use of independent judgment." (§ 12926, subd. (t).)

Sassman and Sevigny were lead coordinators and, successively, Gardner's trainers. In the company's hierarchy, above the lead coordinator position was a supervisor, and above that a manager. Two lead coordinators would be scheduled on a shift; on-site supervisors would leave at 10:00 p.m. and from then until 6:00 a.m., the leads would be the only ones in the room supervising employees, with an on-call supervisor who could be contacted by

31

phone if needed.  As lead coordinators, Sassman and Sevigny did not have authority to hire, fire, or discipline coordinators, determine whether a coordinator would work past a rest or meal period, approve overtime compensation or requests for vacation, sick leave, or late arrivals.

Gardner argues that Sassman and Sevigny were her supervisors "as a matter of law" because they directed, assigned, reviewed, and assessed her work and "controlled when she could take breaks if she was on a call."  This description overstates the evidence.

Asked whether she directed Gardner's activities, Sassman testified, "if she asked," and "I would direct her if she needed directing."  She did not specifically assign Gardner tasks but would ask if she needed Gardner to do something, as with anyone else.  Sassman testified, "We kind of come in to work, the calls roll in, you had to do what you're doing on the call, yeah, if I needed her to do something, yes, I would definitely ask, but no different than anybody else.  [¶] If she took the call or had questions on the call, I'd help direct her on the call if she had questions. . . ."  Asked whether she assigned all the tasks and directed [Gardner's] activities during the hours no other supervisor or manager was on site, Sassman testified, "not necessarily because you're responsible for that call when it comes in so you in-take the call, if you don't know what to do with that call, you can then ask me for direction . . . I did not direct her.  It's just on everybody on that shift to be responsible for taking on the task of answering the phone.  [¶] It rings to everyone in the room so I wouldn't direct her to answer the phone necessarily, but . . . she would answer the call and then . . . whatever goes from there.  If she needed directing or direction, I would direct, but I didn't assign her to tasks to do necessarily."

32

Sassman kept training logs, which would sometimes include positive or negative notes regarding the trainee's performance and would be reviewed by the shift supervisor, who would meet with employees about their training. Sassman provided feedback on Gardner's training when asked by her supervisor, but did not participate in overall performance evaluations and was not the one to determine when Gardner was ready to take the test to become a coordinator. She testified, "I was a lead on shift. Not a supervisor. Just to make sure clear." Asked whether she could direct an employee to continue with a call over a scheduled break period, Sassman testified, "I wouldn't expect her to just hang up on the person in the middle of the call and then take her break. . . . I wouldn't have her hang up the phone during a call phone [*sic*], but, yeah, if she was going to take a break and a call was coming in, I wouldn't be like, 'Oh, no, you can't. Make sure you stay here.' I think we all kind of pull our weight on shifts." She acknowledged she could determine the timing of the break after the call ended.

The type of supervision and control described in this testimony is considerably different from that in *Chapman v. Enos* (2004) 116 Cal.App.4th 920 (*Chapman*), upon which Gardner relies. The issue in *Chapman* was whether a deputy district attorney was the supervisor of an investigator for purposes of the investigator's sexual harassment suit based on his direction of her work. The trial court modified the standard jury instruction, which defines "supervisor" according to the section 12926 definition, by adding that, for a person to be a supervisor based on responsibility to direct the work of others, the person giving the direction must be "directly responsible for the performance of his or her department or unit and must be fully accountable and responsible for the performance and work product of the employees in his or her department or unit." (*Chapman,* at pp. 926–927.) *Chapman* found

this instruction erroneous because it added requirements of full accountability and responsibility that are not required by the FEHA definition of supervisor. (*Chapman,* at p. 930.) The court found there was evidence the deputy district attorney was the investigator's supervisor in that he "directed her day-to-day duties to conduct investigations and trial preparation on cases, and outlined her role in meetings and trainings"; in a two-year period, the investigator received only three assignments from others; the chief investigator (the investigator's ultimate supervisor) would ordinarily obtain information from the deputy attorney general in order to evaluate the investigator working in the unit; the investigator "always cleared her time off with [the deputy district attorney] before having it approved by the chief investigator"; and the investigator believed the deputy district attorney was her "supervisor or 'boss.'" (*Id.* at p. 930.)

In the present case, the direction Sassman provided was primarily in her role as Gardner's trainer, answering questions or informing Gardner how to handle the calls that came into the transfer center. Sassman's testimony indicates that she did not assign Gardner tasks or direct her work in the sense discussed in *Chapman*; she provided support and assistance to help Gardner learn and perform the tasks required of all transfer center coordinators.

In any event, even if we were to conclude the trial court erred in finding Sassman was not a supervisor, Gardner has not demonstrated she was prejudiced as a result. The significance of the ruling, as we have said, is in whether Sassman's knowledge of Gardner's medical condition can be imputed to Calstar. Sassman testified at an Evidence Code section 402 hearing that she knew Gardner "had had miscarriages before" and "had pregnancy related issues and had had miscarriages in the past." Asked whether "before" meant

34

before Gardner worked at Calstar, Sassman replied, "Honestly, I don't know. I would assume— I mean, I don't know." She did not remember whether Gardner told her she had had a miscarriage while working at Calstar. Nor did she recall Gardner saying that working the night shift was making her sick: "[I]t was just kind of we were talking casually as, you know, colleagues. Not necessarily work related." Since Sassman did not know when Gardner's miscarriage occurred and did not know that Gardner had medical issues related to working the night shift, imputing her knowledge to Calstar would not have bolstered Gardner's case. As the trial court noted, "even if she were the supervisor, there is no knowledge to impute based on the record we have to Calstar." Moreover, Gardner does not explain how evidence that Calstar was aware of her miscarriage would have made it reasonably probable the jury would have found she had a disability that limited her ability to do her job. Knowledge of the miscarriage would not have altered the fact that Calstar was given no information as to how Gardner's medical condition affected her ability to do job functions that were identical on day and night shifts.

Sevigny's description of his role was similar to Sassman's, although Sevigny testified that lead coordinators on the night shift would take on "a more supervisory role" because there were no "official supervisors" on night shift, although there was someone on call. Sevigny testified that, as a trainer, he could assign tasks to the trainee and would go through the training binder with the trainee and "sign off" on "things that had been covered" and whether "proficiencies were met." Sevigny testified that because critical calls would have to be taken care of immediately, "there had to be a level of flexibility when breaks could occur" and "[c]ertainly there were

35

times when . . . your break would have to be postponed."  As soon as the "workflow dies down, of course, make sure people get their allotted breaks."

Although Gardner includes Sevigny in her argument on appeal, the trial court was not asked to and did not make a specific finding as to whether Sevigny was Gardner's supervisor.  The parties briefed the supervisor issue only with respect to Sassman, and the trial court noted that she was the person Gardner wanted to establish as a supervisor "because Mr. Sevigny knew nothing."  Sevigny testified at an Evidence Code section 402 hearing that Gardner never mentioned having had a miscarriage to him.  He was aware that Gardner was "not feeling well," had "a lot of stress," and was "having a hard time with sleeping, with adjusting to the schedule and things like that," but this testimony was presented to the jury.  Gardner suggests nothing Sevigny was aware of that could have affected the jury's verdict, but was excluded under the trial court's order.

## DISPOSITION

The judgment is affirmed.

Costs to Calstar Air Medical Services.

                                       _____

                                       Kline, P.J.

We concur:

_____

Stewart, J.

_____

Miller, J.

*Gardner v. Calstar Air Medical Services, LLC* (A158636)